

SUSAN HAWK
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

December 15, 2015

Texas Court of Criminal Appeals
P.O. Box 12308
Austin, Texas 78711

Re:   *Ex parte Stanley O. Mozee*; WR-82,467-01, W99-02631(A) and
      *Ex parte Dennis L. Allen*; WR-56,666-03, W00-01305(B)

Dear Mr. Acosta:

Enclosed are the following documents related to the above-referenced case numbers: *State's Objections to Trial Court's Supplemental Findings of Fact on Remand* and *State's Motion for General Remand*. Please file the original and return the enclosed copy, file-marked, to me at Patricia Cummings; Assistant District Attorney; 133 N. Riverfront Blvd., LB 19; Dallas, Texas 75207.

Please contact me at 214-653-3600 if you have any questions. Thank you for your time and attention in advance.

Sincerely,

PATRICIA CUMMINGS
Assistant District Attorney
Conviction Integrity Unit
Dallas County, Texas

Encl.

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 18 2015

Abel Acosta, Clerk

NOS. WR-82,467-01& WR-56,666-03
CAUSE NOS. F99-02631-R, F00-01305-R
WRIT NOS. W99-02631-R(A) and W00-01305-FR(B)

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | 203RD JUDICIAL DISTRICT |
| | § | DALLAS COUNTY, TEXAS |
| | § | |
| | § | AND |
| | § | |
| STANLEY ORSON MOZEE | § | |
| & | § | THE TEXAS COURT OF |
| DENNIS LEE ALLEN | § | CRIMINAL APPEALS |

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 18 2015

Abel Acosta, Clerk

## STATE'S OBJECTIONS TO TRIAL COURT'S
## SUPPLEMENTAL FINDINGS OF FACT ON REMAND

The State, having been notified of the *Trial Court's Findings of Fact on Remand* in the above numbered and entitled causes, respectfully asserts the following objections in these habeas corpus proceedings:

### I.

### THE TRIAL COURT'S SUPPLEMENTAL FINDINGS
### ARE UNSUPPORTED BY THE RECORD

On October 28, 2014, after considering the entire record in these causes, the trial court signed Agreed Findings of Fact and Conclusions of Law finding that the State suppressed exculpatory evidence[1] in violation of *Brady v.*

---

[1] The suppressed exculpatory evidence is numerous letters from two testifying jailhouse informants and the substantive discussions the State had with the informants underlying the correspondence.

*Maryland* and that the State presented false testimony from one of the informants that went uncorrected by the State. On February 4, 2015, this Court issued a remand order directing the trial court to provide the trial prosecutor an opportunity to respond to the *Brady* claims. Following receipt of the remand order, the Judge recused herself sua-sponte and Applicants' cases were transferred to the 203rd Judicial District Court.[2]

An evidentiary hearing was held on October 26 – 27, 2015, during which testimony from the lead trial prosecutor – Rick Jackson – was heard. On October 27, 2015, Jackson informed the trial court and the parties that he had a doctor's appointment early that afternoon. As a result, the trial court and the parties agreed to excuse Jackson early with the understanding that he would be kept under the rule and remain available for further testimony. Then, before either party rested and closed, the trial court entered its *Findings of Fact on Remand*[3] on November 10, 2015 – approximately ten days *before* the reporter's record was prepared.

The trial court's supplemental findings specifically find Jackson's testimony to be credible. They also find that, even though Jackson has no

---

[2] The term of the Judge of the 265th Judicial District Court who signed the Agreed Findings of Fact – the Honorable Mark Stoltz – expired on December 31, 2014. The new Judge of the 265th Judicial District Court, the Honorable Jennifer Bennett, recused herself from these cases upon its remand. As a result, the cases were reassigned to the Judge of the 203rd Judicial District Court – the Honorable Teresa Hawthorne.

[3] Hereinafter referred to as the trial court's supplemental findings.

*State's Objections to the Trial Court's Findings of Fact on Remand*          Page 2 of 11
Stanley O. Mozee – WR-82,467-01; W99-02631-R(A); F99-02631-R
Dennis L. Allen – WR-56,666-03; W00-01305-R(B); F00-01305-R

independent recollection of turning over the informant letters, both Jackson's meticulous trial notes, and Jackson's belief that an entry he found on one of those notes, support that the informant letters were "turned over" to defense counsel for both Applicants.[4]

The State respectfully objects to the trial court's supplemental findings in both cases because they are unsupported by the record. *See Ex parte Bagley*, 509 S.W.2d 332 (Tex. Crim. App. 1974) (holding that the Court of Criminal Appeals is not bound by the trial court's findings in a habeas corpus proceeding and may make contrary findings when the trial court's findings are not supported by the record.)

A. The Trial Record

A thorough review of the entire trial record in both cases establishes the informant letters were not disclosed to defense counsel. The State's circumstantial case against Applicants relied heavily on informant testimony. At the time of trial, Applicant Allen was represented by Jim Oatman who

---

[4] Although the trial court's supplemental findings say "turned over," Jackson testified he was unable to say whether the informant letters were shown or copies provided. The trial court also entered a finding that Jackson testified that he did not violate *Brady v. Maryland* in this cause. This finding is not supported by the record.

argued to the jury he personally believed he was representing an innocent man.[5] Applicant Mozee was represented by Matt Fry.[6]

On August 28, 2000, the day Applicant Allen's jury trial began, the trial court conducted a pretrial hearing before voir dire affording both sides an opportunity to address matters that needed to be resolved prior to trial. During the hearing, the defense made an extensive record regarding the issue of exculpatory evidence. Oatman started out by discussing exculpatory evidence that had been previously disclosed by the State and then followed up by specifically requesting additional information regarding those exculpatory disclosures.[7] Then Oatman made a record regarding exculpatory information that had not been disclosed by the State. Throughout the hearing, the defense requested copies of all documents that contained the exculpatory information.

A significant amount of time during the pretrial hearing was spent discussing the State's failure to disclose exculpatory information regarding a

---

[5] Oatman is deceased and his trial file no longer exists. During the writ hearing, both Rick Jackson and former District Judge John Cruezot testified that Jim Oatman was a very good attorney.

[6] Fry's trial file was turned over to Applicant Mozee. Part of the evidence Applicant Mozee intended to introduce once the writ hearing was reconvened was either testimony or an affidavit from Fry. Unfortunately, the trial court's supplemental findings were entered before the hearing could be reconvened. However, it is important to note two significant facts. First, the supplemental findings fail to address the fact that the note relied on to support the finding that the informant letters were turned over was found in the Allen DA trial file, it was written *after* the Mozee trial and it specifically referred to Oatman. Second, Jackson admitted in his testimony that the second Zane Smith letter was exculpatory and he never disclosed it to Fry.

[7] It appears that the defense was referencing exculpatory information turned over by the State which was listed on Jackson's note dated December 8, 1999 titled "Items Turned Over to Δ Atty Jim Oatman for Δ = Dennis Allen," admitted at the writ hearing as Defense Exhibit 15.

witness named Steven Linwood. Ultimately, even though Jackson's own trial notes (Defense Exhibit 14) list Linwood's information under the heading "exculpatory," Jackson argued to the trial court that the Linwood information was not exculpatory, yet he agreed to give Oatman the relevant investigative notes.

At the conclusion of the pretrial hearing and after the parties were released by the trial court to reconvene for jury selection at 1:30 p.m., the trial court inquired as to whether any other hearings needed to be conducted. Then after a discussion off the record, Jackson made the following statement:

> Judge again, out of an abundance of caution, there was some anonymous information given to the detectives that was followed up on with no result. And I'm going to turn over investigative notes on those just so there's – *and that's everything that I can think of that's even remotely exculpatory*, even though it didn't lead to anything. So technically it's not exculpatory, but out of an abundance of caution I'm going to turn it over just so he has it. (TRR2: 56) (emphasis added)

Although it is not clear, it appears Oatman's thoroughness in making a record of the exculpatory evidence provided by the State may have prompted Jackson to make those statements. Notably, the informant letters were not mentioned in Jackson's statements to the trial court nor were they addressed directly or indirectly anywhere else in the pretrial record.

During voir dire in Allen's trial, both sides questioned the panel about the use of informants. The State elicited information from the panel by

suggesting that informant witnesses fell into three categories – those that were paid, those that received a deal in exchange for their testimony, and those that testified simply because they were concerned citizens. The State then informed the panel that if an informant witness had a deal with the State, the jury would hear about the deal so they could use that fact to determine whether the informant witness was credible.

During the defense voir dire, Oatman questioned the jury panel in general about informant testimony, and in particular about the State's dealings with informants and Oatman's *inability* to point to any document indicating that a deal existed between the State and an informant. When questioned by the panel as to what he meant, Oatman said, "I'm saying that the witness says there is no deal. And I'm not there, I wasn't there when he negotiated with the State of Texas or the police or both. And I can't bring you a written contract because they don't have written contracts for deals." (TRR2: 170). He then attempted to make it clear to the panel that if such a "deal document" existed and he had it, he would certainly use it to impeach the witness's credibility – but otherwise jurors would have to ultimately rely on their common sense to determine the credibility of the testimony.

Further, the trial record reflects Oatman continued to zealously represent Applicant Allen throughout the entire trial. He conducted intense

*State's Objections to the Trial Court's Findings of Fact on Remand*
Stanley O. Mozee – WR-82,467-01; W99-02631-R(A); F99-02631-R
Dennis L. Allen – WR-56,666-03; W00-01305-R(B); F00-01305-R

Page 6 of 11

cross examination of witnesses, including the authors of the informant letters, Lonel Hardeman and Zane Smith.[8] The record is clear that Oatman was attempting to impeach Hardeman and Smith with the very type of information contained in the informant letters – however, as foreshadowed during voir dire, he had no extrinsic evidence to assist him in the impeachment process. The simple fact that Oatman did not use the informant letters during cross-examination of these witnesses – in light of the fact that Hardeman testified completely contrary to what he wrote in his letters and there was no mention of the Smith letter directly addressed to Jackson – supports the conclusion that Oatman had no knowledge that the informant letters even existed.

During the Mozee trial, the State's rebuttal case relied heavily on Smith's testimony. Smith's testimony was inconsistent with information contained in both of his letters. Fry, however, did not impeach Smith with the first letter. A note in Fry's trial file written by Fry on the first day of trial reflects that Jackson never advised Fry of Smith's existence, let alone his statement, until that day. Further, there is no indication in Fry's note that Jackson disclosed the first Smith letter to Fry.

---

[8] There are two informant letters at issue with Smith – the first one is dated June 28, 2000, and the second one is dated August 2, 2000. There is no reference to the first Smith letter anywhere in the Mozee trial. The second Smith letter was written less than 30 days after Mozee was convicted and sentenced. The first letter was used in the Allen trial, the circumstances of which constitute further evidence as to the failure of the State to disclose any of the informant letters.

## B. The Writ Hearing

During the writ hearing, Jackson was extensively questioned about his discovery practices during the prosecution of Applicants. He admitted at the hearing that the informant letters were exculpatory information that the defense would have been entitled to under *Brady v. Maryland*. However, Jackson testified repeatedly that he did not have any specific, independent recollection of turning over the informant letters. He also testified that although he was provided an opportunity to review the DA's trial file and he was given an electronic copy of the reporter's trial record, he spent only a few hours refreshing his recollection and preparing for his testimony.

According to Jackson, when the State provided him access to his DA trial file in preparation for his testimony, he concentrated his efforts on combing through the file in an effort to find proof that he turned over the informant letters. While he did not find any specific documentation that he turned over the informant letters to defense counsel, Jackson found his handwritten note in the Allen DA trial file titled "Show Oatman," dated on the first day of Applicant Allen's trial – August 28, 2000. It is this note that Jackson and the trial court believe supports the conclusion that he produced the informant letters to defense counsel in both cases.

*State's Objections to the Trial Court's Findings of Fact on Remand*
Stanley O. Mozee – WR-82,467-01; W99-02631-R(A); F99-02631-R
Dennis L. Allen – WR-56,666-03; W00-01305-R(B); F00-01305-R

Page 8 of 11

Jackson testified that the entry on the "Show Oatman" note reflecting that he showed Oatman the "Knife + *Rest of Physical Evidence*" means that he disclosed the informant letters to Oatman on the first day of trial (emphasis added).[9] However, the argument that this note constitutes proof that Jackson disclosed the informant letters because they are "physical evidence" is not credible. In general, the ordinary and common use of the term "physical evidence" in the criminal context does not include witness statements.

In this case in particular, Jackson's trial practices establish he understood this distinction in light of the remaining entries on the note. Specifically, the note reflects how methodical Jackson was in documenting the production of exculpatory information. In fact, the last five lines written on the note summarize the exculpatory information discussed and produced in the pretrial hearing precisely detailing the author and date of each investigative report for documentation purposes. *See* State's Objection Exhibit 1.

## II.

## THE FINDINGS ARE BASED ON AN INCOMPLETE RECORD

During the writ hearing, Applicants advised the trial court that they intended to present further testimony and noted that they may need to recall

---

[9] From a practicality standpoint, Jackson's interpretation of the note is not tenable given the size of the DA trial file, the process Jackson described he would have used to disclose the informant letters to Oatman, and the time frame that was available the first day of trial given the extensive pretrial hearing and the fact that voir dire started at 1:30 p.m. *See* WRR1: 132-35.

Jackson.[10] Applicants also advised the trial court that, in light of Jackson's testimony, they planned to amend their writ of habeas corpus applications which would further necessitate a continuation of the hearing. The Court agreed to set another hearing date.

Applicants filed their amended habeas applications after the hearing was recessed. Instead of setting another hearing date to allow the parties to further develop the record and conclude the hearing, the trial court issued its supplemental findings.[11] As a result, the State is filing a Motion for General Remand so this Court can have a fully developed record on all of the issues in Applicants' writs.

## III.

## CONCLUSION

For the aforementioned reasons, the State respectfully requests the Court of Criminal Appeals reject the trial court's *Findings of Fact on Remand* and render relief as set out in the trial court's findings on October 28, 2014. Alternatively, the State requests that the Applications and Amended Applications be remanded to the trial court for further fact finding as requested in the State's Motion for General Remand.

---

[10] Jackson informed the trial court and the parties that he would be unavailable to testify from November 5, 2015 until early January 2016.

[11] Since the hearing, the State has continued to investigate Applicants' claims and has discovered additional exculpatory evidence which appears to further support Applicants' claims and impeach Jackson's testimony.

Respectfully submitted,

**Susan Hawk**
**Criminal District Attorney**
**Dallas County, Texas**

_[signature]_

**Patricia Cummings**
**Special Fields Bureau Chief**
**Assistant District Attorney**
State Bar No. 05227500

_[signature]_

**Cynthia R. Garza**
**Assistant District Attorney**
State Bar No. 24045924

Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3600
(214) 653-3643 *(fax)*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing response was served on Gary A. Udashen – attorney for Applicant Allen – and on Ezekiel Tyson , Jr. – attorney for Applicant Mozee – on December 15, 2015.

_[signature]_

Patricia Cummings

*State's Objections to the Trial Court's Findings of Fact on Remand*
Stanley O. Mozee – WR-82,467-01; W99-02631-R(A); F99-02631-R
Dennis L. Allen – WR-56,666-03; W00-01305-R(B); F00-01305-R

Page 11 of 11

# State's Objection Exhibit 1

Jackson's "Show Oatman" note with attached DPD investigative supplements referenced therein

# Show Outline

8/28/00

Knife & Rest of Physical Evidence
- New Greyscales Print

Videos & Video Stills — No Video from Stop, burn dark or scratchy

Diagrams / Blow Ups

✓ Close 4/23 — 2 unidentified people that someone because
✓ Beazley 4/28 — 2 Blus. Try to see why because
✓ Beazley 5/3 — Luxsco 10, one or 2 Blus, & Video as Forensics
✓ Beazley 5/14 — Rhodes Stummer says someone thinks about video
Beazley 7/23 — Video news "Black Ice" at their interview

COMPLAINANT: BORNS, JESSIE

SERVICE #: 238462-H
FOR DET. : BERRY

# INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: Clark    DATE: 4-23-99

INFO OBTAINED VIA: Phone

OBTAINED ON DATE:    4-23-99    AT TIME:    7:00 pm

TOPIC: POSSIBLE OFFENSE INFORMATION

NARRATIVE:

On 4-23-99, Detective Carollo received a phone call regarding this case. A black male, who only identified himself as Ronny, phone # 214/426-6461, stated that a person who might know something about this offense was at the Royal Palace Club parking lot. He described the individual as a black male, tan shorts, striped shirt, and gold rim glasses.

Detectives Clark and Reideler went to the Royal Palace Club at Colonial and Pennsylvania but were unable to locate the subject. "Ronny" was recontacted by phone, but he was no longer at the scene and did not provide any additional information. "Ronny" also advised that "Carol", 214/371-7045, might also have additional information.

While in the area, an unidentified black male and black female told officers that a black male had been bragging about committing this offense. They pointed the suspect out and he was detained by Detectives Clark and Reideler. He was identified as Loyce Gassaway, B/M/8-9-52. Detective Berry has already spoken to this subject. The unidentified black male and black female left the area and could not be located.

The black male subject told Detective Clark that he was working for a Mesquite P.D. detective looking for a robbery suspect known as "Miami", who was known to frequent the area.

Ronnie Wayne Shumaker B/M/ 5-1-59
Carol Shumaker B/F/ 11-21-60
3717 Utah
(214) 371-7045
Pager # 214-910-6135

1

Follow up required: Yes        No                Key words: _____

Supervisor Approval: _____         _____
Document5

000292

COMPLAINANT: **BORNS, JESSE**                    SERVICE #: **238462-H**
                                                 FOR DET. : **BERRY**

# INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:   **BERRY**     DATE: **4/28/99**

INFO OBTAINED VIA: **INTERVIEW**

OBTAINED ON DATE:     **4/27/99**   AT TIME:


        TOPIC: **INTERVIEW OF RODERICK MAY**

NARRATIVE:

        While taping a Crime Stoppers segment, I spoke to **Roderick Charles** at the **Envogue Hair Salon.** He introduced me to the following:

              Roderick May B/M/7-15-79
                     1323 Lenway
                     Dallas, Tx.
                   (214) 421-2997
            work - Ben Howard Plumbing
                   2830 M.L. King
                   (214) 421-4206

May told me that around 10:00 p.m. on the night before the complainant's body was discovered, he was walking on Colonial towards M.L. King when he was approached by two subjects who attempted to sell him some pagers. He stated that the pagers were inside of a plastic Minyards sack, and were different colors. He stated that they wanted to sell him the whole sack of pagers for $5.00 a pager. May declined the offer and walked away. He stated that he observed the subjects walk in to the **Colonial Motel.**
        May stated that he had seen these subject before in the neighborhood, but had not since this meeting. He stated that he had seen them at the Colonial Motel, the Hasty Liquor Store, and some apartments on the north side of M.L. King, across the street from the offense location.

**May described these subjects as follows:**

          1.   B/M/32-33, "bright" complexion;
                  5'6", medium build;
               Short hair, light beard;
                 Scar under left eye;
           "Something black on his neck";
      Wearing a plaid shirt and black tennis shoes.


          2.   B/M/35, dark complexion;
                  5'9", medium build;
          Medium length hair, full light beard;
      Wearing a blue jean shirt and blue jean pants.



                    8462hjbn.rb16
                         2
_____

Follow up required: Yes       No          Key words:_____

Supervisor Approval: _____        _____
Document2

                                                      000300

# INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:     **BERRY**    DATE: **5/3/99**

INFO OBTAINED VIA: **INTERVIEW**

OBTAINED ON DATE:      **5/3/99**    AT TIME:


TOPIC: **INTERVIEW OF STEVEN LINWOOD**

NARRATIVE:

   **Alvin Degraftenreed** had been interviewed regarding this offense (see note 8462hjbn.rb17.) He stated that a person he knew by the name of **Steve** might have some information regarding this offense.
   At approximately 9:00 p.m., I was paged by Degraftenreed, who stated that Steve was sitting at the bus stop at M.L. King and Colonial. I contacted Dets. Perez and Carney, and they went to that location and contacted the following:

          **Steven Lee Linwood B/M/8-10-64**
          **1818 S. Ervay (Bunkhouse Shelter)**
                    **Dallas, Tx.**
               **Work - Jack McAdams**
                  **1211 Levee St.**
                 **(214) 748-6417**

Officer Starr #7420 transported Steven Linwood to CAPERS.
   I interviewed Linwood regarding this offense. He stated that he had no direct knowledge regarding this offense. He did he recall the night of this offense because he had a run in with a group of teenagers who threw bottles and other objects at him and some other men as they sat at the bus stop. He stated that around 7:00 p.m. that evening he saw the following person in the area of the offense location:

          **B/M/40, 5'8", 150-160 lbs;**
               **"Bright" complexion;**
          **Thick mustache, low cut hair;**
          **Scar on the right side of his neck;**
               **Dressed in plaid shirt.**

   Linwood stated that he had seen this subject walking back and forth from the **Sportsmans Lounge** to the bus stop several times during that afternoon and evening. The subject appeared to be intoxicated, and at times spoke to the group that Linwood was with. Linwood stated that this subject talked to a person that Linwood described as follows:

          **"Anthony's cousin", B/M/25;**
               **5'10", 210 lbs.;**

**Linwood stated that this subject had been fired from a beer store on M.L. King, west of the KFC, sometime in the past couple of**

2

000302

**weeks.**

Linwood stated that he saw the first subject sitting on a bench in front of the Sportsmans Lounge on Thursday, 4/29/99.

During this interview, I showed Linwood the videotape from the **EZ Mart Store.** I asked him if he recognized anyone in the videotape. He stated that the shorter individual resembled a person he knew by the name of "Dave", who drives a yellow Cadillac. He stated that this subject had been picked up by detectives and interviewed about this offense. I showed Linwood a six-photo lineup of Daniel Jennings, B/M/1-15-45, whom Det. Davison and I had interviewed on 4/29/99 (see Davison's note.) Linwood identified Jennings as the shorter person wearing plaid shown in the videotape.

8462hjbn.rb18

LOW UP REQUIRED:       YES       NO                KEY WORDS:_____

000303

COMPLAINANT: **Borns, Jesse**

SERVICE #: **238462H**

FOR DET. : **Berry**

## INVESTIGATIVE FOLLOW-UP INFORMATION

SUBMITTING OFFICER: **J.A. Davison**    DATE: **05/14/99**

INFO OBTAINED VIA:

OBTAINED ON DATE:      **04/28/98**   AT TIME:

TOPIC:

NARRATIVE:

On 04/28/99 Ned and I interviewed Ronald Shumaker b/m/05/01/59, 3217 Utah, 214/371-7045, at his residence. Prior to this interview Shumaker notified Homicide Detetective Carollo on 04/23/99 regarding possible offense information. Shumaker told Ned and I that there was a black male in the area of Colonial and Martin Luther King talking about this offense. On 04/29/99 at 8:30 p.m. Ned and I located Daniel Jennings b/m/01/15/45, 514 Ft. Worth Avenue #32, at a bus stop on Colonial at Martin Luther King Blvd. Jennings agreed to go to Capers and was later interviewed by myself first and then Berry.

Jennings told me that he didn't know anything about what happened. Jennings denied any involvement. Jennings says he didn't know the comp, didn't know about the killing. Jennings also said he didn't know where the place was where the comp was killed. Jennings said he has never been at the place where the man was killed. Jennings had no alibi. Jennings said he doesn't know where he was the day the offense occurred.

Jennings had a pocket knife on his person. The knife was confiscated and submitted to PES by Detective Berry. Jennings gave consent to Berry to search his yellow Cadillac and his residence.

238462H BORNS BERRY.kay1

# INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:    BERRY    DATE: 7/23/99

INFO OBTAINED VIA: INTERVIEW

OBTAINED ON DATE:    7/8/99    AT TIME:


TOPIC: **INTERVIEW OF STAN MOZEE**

NARRATIVE:

On 7/7/99, I spoke to **Charles Manning** and asked him if he knew someone named "Stan" who may be an associate of D.A.  Manning stated that he did.  He stated that Stan was homeless, and had once shared a vacant apartment with D.A. and his girlfriend, Felicia.  Manning stated that Stan was about 6'0", 200 lbs., and had a salt/pepper beard.

On 7/8/99, Manning contacted me by phone and told me that he had seen Stan at the Shell Gas Station located on M.L. King at S.M. Wright.  Det. Muniz and I went to the Shell Station and contacted the following:

**Stanley Orson Mozee B/M/4-21-59**
**Homeless, Dallas**

I told Mozee that his name had come up in an investigation and asked him to come to CAPERS to talk about it.  He agreed to come. I asked him if he had any information regarding this offense, and he stated that he did not.  I asked Mozee if he knew the complainant, and he stated that he had done some work for the complainant a few times before his death.  I asked him if he remembered where he was on the night of this offense, and he stated that he did not remember.  I asked Mozee if he knew anyone named D.A., and he stated that D.A. had pulled a knife on him once after Mozee had gotten into an argument with D.A.'s girlfriend, Felicia.  I asked Mozee if he had heard any talk on the street regarding this offense, and he stated that he had heard that a guy named **"Black Ice"** might be involved.  I asked Mozee if he would find out Black Ice's real name and contact me with that information, and he stated that he would.


8462hjbn.rb25


1

Follow up required: Yes        No          Key words:_____

Supervisor Approval: _____        _____
8462hjbn.rb25


000317